The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. If I try to say your name, I will butcher it so badly, you might get mad. No problem, Your Honors. Good morning, Samantha Heifetz for the United States. The case here on appeal, in the district court, the district court set aside the CMS interpretation that's at issue in this litigation on two independent bases. The court concluded that it was procedurally invalid, and while we, of course, disagree with that court's analysis there and think it's premised on certain misconceptions about how this scheme operates and the function and role of the interpretation at issue, the court went on. There was no dispute here that that would have been a sufficient basis for setting aside the challenge interpretation,  but the court went further and it announced that this interpretation was, quote, unambiguously foreclosed by the statute along with the regulatory text. And now that's a really significant and troubling part of the court's ruling because it effectively prejudges the 2017 rule that was promulgated, a legislative rule. Well, if the court's district court was correct and offered the same interpretation other district courts have offered, wouldn't that end this case? I missed the first part of your question, Your Honor. Well, if the district court is correct and its statutory definition analysis is valid, wouldn't that end this case? Your Honor, yes. And that's why I'd like to start there because we think that that part of the district court's reasoning is wrong and we are particularly eager to have this court address it to correct the district court because of the effects of that part of the district court's ruling in prejudging and essentially, you know, pretermitting the litigation around the 2017 rule. So your main concern is that we simply vacate the court's substantive judgment? Well, we would like reversal on both grounds, but for the purposes of the oral argument, I certainly would like to start with the statute. So to go to Judge — Explain that to me. I'm going to say, for purposes of oral argument, we would like — I don't understand — I'd like to, with the court's permission, begin my argument by focusing on the statute. Well, my question is, is your concern that you want us to vacate the district court's substantive judgment? Vacate or reverse? I'm responding to Judge Agy's question, follow-up. That's my question. So, yes, I mean, we would like to see vacater or reversal of the substantive judgment, as well as reversal, of course, of the procedural. You'd like us to do what the First Circuit did and just punt on the substantive question? Well, we would like you to do what the First Circuit did in terms of its analysis of the substantive issue at a minimum. I mean, we think you could here go further and make clear that this is a permissible construction of the statute, but at a minimum, what the First Circuit did with regard to the statutory determination. I thought the First Circuit said that we're just not going to get into the statutory analysis. We're just going to go with the procedural part. But there, the district court hadn't reached the statutory issue. That's the difference. Here, the district court did go so far as to say that this interpretation is foreclosed by the statute. All right. Well, let's talk about the statute. Yes, please, Your Honor. So in looking at 96R4G1A, the statute uses two key terms, apparently, which the Secretary has discretion about, and then it sets out net payments. And net payments are Medicaid payments and whatever uninsured patients would pay. Third-party pays aren't in there. What else is there to say about it? Well, here's what there is to say. What the Congress said was that we need to figure out what costs incurred by the hospital in treating Medicaid patients and the uninsured are. And then it said two things. Well, would a third-party payment be a net payment or a cost? So we have explained that we think costs incurred has to take account of these third-party payments because this is a statute in both G1 and later in 2003 in creating subsection J, Congress made very clear that what we're interested in here is determining uncompensated costs, but they also refer to it in the legislative history as unreimbursed costs. I'm not sure that's what the statute says. I mean, just wait a minute. I mean, we have to go by what Congress says, not what someone may think is the proper policy judgment. That's up to Congress and the executive branch, not us. So Congress differentiated in the statute between cost incurred and net payments. And it seems to me something of an Alice in Wonderland approach to say that a payment from a third party somehow becomes a cost. That just doesn't make any sense. So let me step back and take issue with one word Your Honor used. I don't think it's right to say that Congress differentiated between costs and payments. What Congress did was tell the Secretary certain things about how to calculate. May I finish? You stop talking. They said, you know what his question is. Absolutely, Your Honor. I was just hoping to answer the first question. Of course. Of course, Your Honor. Of course. No, I apologize. That was my attempt to apologize. Stop. Stop talking. Relax. Take a deep breath. We all need to. Judge Agee has a question he wants to ask. Yes, Your Honor. So that you understand his question, please don't say anything until he's finished his question. So in G1A, the statute sets out cost incurred and payments. And your argument, as I understand it, is that somehow a payment from a third party can morph into a cost incurred. That's not anywhere in the statute. And we only have to look to the next subsection of the same statute. Under 2A, to see that when Congress wanted to have third party payments included as a payment, they said so specifically. So here we have this differentiation within the same statute. And our rules of construction say that when Congress does that, they intended to do it. Doesn't matter what we think. Doesn't matter what you think. It's what Congress said. So I'm at a loss to understand how a payment can become a cost. Now, you go ahead. Thank you, Your Honor. It is not that the payment morphs into a cost. It is that to determine what the costs incurred are, we have to follow Congress's instructions. And Congress said that what costs incurred are is, first, to be determined by the Secretary. So there is a delegation of authority. Second, we come to the language Your Honor has highlighted. The language about payments is not some differentiated category. It is part of the definition of costs incurred in that it's part of the instructions. So we know from Congress that to figure out what the costs incurred are, at an absolute minimum, we have to deduct. It has to be net of, to use Congress's language, costs incurred must be net of Medicaid payments and payments on behalf of the uninsured. That's just taking from the statute. Would the Secretary, under your theory, have the authority to determine that a payment by an uninsured patient, they pay a dollar when they come into the hospital, that that's a cost? That is, under Congress's definition, that's, as a statutory matter, costs incurred It's not that the dollar becomes a cost. It's that whatever the gross costs were have to be reduced by a dollar to get us to net of payments. That's just following the statutory language. To determine costs incurred, it must be net of certain payments, Congress said. So it's not that the payments become costs. It's that they're subtracted from whatever the gross cost category might be. Now, what the Secretary did, pursuant to the language right before the net payments language, which is the express delegation to the Secretary, as determined by the Secretary, the Secretary determined that those payments, the Medicaid payments and the payments for the uninsured, are not the only payments that need to be deducted if we are to determine, consistent with the whole of this statute, what the costs incurred are. And the whole of this statute includes the fact that Congress wrote this is supposed to be an amount of adjustment subject to uncompensated costs. And then in subsection J, later on, when we get the auditing and reporting requirements that the 2008 regulation implements, Congress says that the states are going to be required to certify that the, that only the uncompensated care costs of providing inpatient hospital and outpatient hospital services to Medicaid patients and the uninsured are being included in this G1A calculation of costs incurred. Now, I want to get to your, the second part of your question, which was about G2, G2 in comparison with G1. And I just want to be clear that all of the reasons why the rules of construction that Your Honor alludes to are not applicable here. G2 is very different from G1. G1 is, again, about determining uncompensated costs. And let's just keep in mind that plaintiff's position is that costs that have been compensated, that have been reimbursed, covered by payments received from private uninsured, privately insured Medicaid patients, that those should nonetheless be considered uncompensated costs. That's what G1 is about, determining the amount of the cost burden that a hospital is bearing that has not been reimbursed or compensated. G2 is not about uncompensated costs. G2 was, there was a transition period when Congress promulgated this statute. And they created a period of time when they first created the hospital-specific limit. And during that transition, they allowed for hospitals to receive well over up to 200% of the costs of caring for Medicaid patients and the uninsured. So it wasn't about uncompensated costs whatsoever. It's a very different provision. And it looks at the amount of money that hospitals were using for health services. It's not even limited to hospital services, which is what G1 is about. And it's not limited in the part that talks about third-party payers. It's not talking about Medicaid or the uninsured. It's talking about all patients. So when you think of all patients, third-party payers is the appropriate terminology to speak specifically to insured individuals in the world. So these are very different provisions. And the fact that third-party payers shows up in G2, for all of the reasons this Court has explained about the rules of construction, it would not make sense to impute anything about what Congress was trying to achieve in G1 or in J in talking about uncompensated costs. I hope that addresses that question. And I think this context that we've hit upon is really important. The work that the interpretation at issue here is doing, this is all about making sure that costs that have been reimbursed, that have been compensated, aren't then the basis for this supplemental dish funding that states have to distribute. There's a limited pool of funding in each state that has to go out to all of the hospitals. So if one hospital is able to claim funds that have already been compensated to that hospital, that's coming out of another hospital's pocket. And that's the concern that animates this case from the perspective of the government, of the agency. If there are no further questions, I'll reserve the time for rebuttal. I appreciate that. Good morning. Geraldine Edens on behalf of the Children's Hospital of the King's Daughters. The government apparently wants the court to focus on, to look at the statute. And if the court is inclined to do that, which you do not need to do, to affirm the district court as the FAQ 33. What do we need to do then? Pardon me? What do we need to do to affirm the district court? You can look at whether or not FAQ 33 is a substantive rule that amended the regulations that was promulgated, not in accordance with the APA, which is exactly what the First Circuit do. So you can assume everything the government is saying, and you can still reach the APA decision. But to the extent that, since the government does want to focus on the statute itself, there's two important things that the court needs to keep in mind. First, the purpose of the statute as a whole. And you have to construe this section, G1, consistent with the other statute. Do you agree with the district court's reading of the statute? Yes, Your Honor. The district court found that G1 is very specific. It articulates the payments that are to be deducted. And as Your Honor mentioned, you can't transform a cost into a payment. And what the district court based her decision on was, very clearly, she understood that there's two very different groups of patients here. If the district court's reading were correct, wouldn't that make the Question 33 simply ultraviaries? I mean, what authority would there be to render that interpretation if it's contrary to the statute? Again, I think what the court needs to look at is the statute as a whole. G1, the section that we're talking about that the Secretary is trying to— Let's focus on that question. If the statute is as the district court says, or just assume for argument that they were correct, what authority would there be to issue that interpretation if it's contrary to the statute? The authority comes from the operative provisions of the program. And you have to look at Sections A, B, and C. Section A establishes a mandate to the states to provide for an appropriate increase in the rate and amount of payment to dish hospitals like CHKD that treat inordinate numbers of Medicaid patients. Here, CHKD has the largest Medicaid population in the entire state of Virginia. But are you saying that an agency, an administrative agency, can adopt an interpretation of a statute that contradicts the plain language of the statute? No, Your Honor, that's exactly what they can't do. They cannot adopt an interpretation that is inconsistent with the purpose of the program and reads out of the statute the very operative provisions. And again, I would call the Court's attention to Sections A, B, and C. A is a mandate to provide for an appropriate increase, recognizing Congress clearly recognizes that hospitals like CHKD, who have inordinate numbers of Medicaid patients, suffer financially. This is a supplemental program intended to try to stabilize these hospitals. Section B defines what constitutes a dish hospital. CHKD clearly meets the definition and is, in fact, federally deemed to be a dish hospital. But the most important section here is Section C. It establishes the minimum payments. It prescribes the methodologies that the states are to use in order to calculate a minimum payment that would satisfy the mandate under A. All G does is establish the cap. And somewhere between the minimum under C and the maximum under G, the states have a great deal of discretion in terms of determining what the appropriate amount of this supplemental payment is to these hospitals. And the whole purpose of this is to stabilize these hospitals. The facts here, as determined by the District Court, clearly show that CHKD, with a Medicaid population of 70%, is basically threatened to go out of business. That is not what this program is about. The program is about making sure that a hospital like CHKD can keep its doors open so that the poor and the medically needy have access to quality care. You mean a hospital which you have a percentage of patients who have private insurance of the percentage like your hospital? Do you think that's what this is about? The DISH program is about stabilizing hospitals. I'm addressing your hospital. You said like CHS. CHS is rather unique, is it not? I mean, when you think about the number of patients, Medicaid eligible, who also have private insurance, it's unusual, would you not say? No. I think it's important to understand that children's hospitals are fairly unique. They only have two sources of revenue, Medicaid. Unique in terms of Medicaid eligibility is what I'm talking about. Unique in that these particular type of Medicaid eligible patients have private insurance on a level that perhaps others do not. Yes, Your Honor. But again, we're talking about two different populations of patients, and this report understood the difference here. You have a population of the majority of the patients. Medicaid is the only payer. You have a very small percentage of patients that are eligible to receive Medicaid, but their private insurance pays for all of their costs. I mean, this court recognized in the Cabell case that there's a clear distinction between being eligible for Medicaid and being entitled to receive Medicaid. What we're talking about is a very small percentage of Medicaid eligible patients that have private insurance. Medicaid is never billed. Medicaid never pays for any of those costs. Private insurance covers all of it. But now what the government wants to do is they want to now include those revenues from a totally different population to offset all these significant losses that CHKD incurs, treating over 108,000, just in one year, 108,000 Medicaid patients. The district court was very correct in saying you cannot turn an uncompensated cost for Medicaid patients into a compensated cost by taking revenues from a different source. So I want to turn back to this First Circuit way it handled this case and the issues that are before us. If this is a legislative rule and it is procedurally firm, do we need to be talking about these substantive matters? Not at all, Your Honor. Is that a particularly strong argument for you? Absolutely. Why would you not focus on that? Because if that is the case, then what you're telling us is that the court just doesn't need to go there. You can deal with it much the way we do with 1983 cases where we don't deal with issues where we find that it's not a matter that has been established. I totally agree with you, but the government seems to be asking the court to specifically decide the statutory question. I understand what they're asking, but the case here is on appeal because of the matter before us at the district court. So the question is do we affirm or not affirm the district court, not do we go and create and make law because someone asked us to do it. This court can affirm the district court on the procedural. You mean can or should? Should, absolutely should affirm the district court on the basis that FAQ 33 is a substantive change to the regulations. The regulations are very prescriptive and nowhere in the... Is that a slam dunk or is that a matter of argument before us? Because that's not something you've argued, nor the other side, so I don't know. That's a slam dunk. We don't need to worry about that? In my view, Your Honor, it is a slam dunk that FAQ 33 is a substantive amendment to the regulations that was not promulgated in accordance with the APA. That's exactly what the First Circuit did. If that's the case, then all we have to say is you didn't go through the procedural thing. See you the next time. If you want to bring another issue, bring it up in a way in which it is probable. Right. If the agency goes back and promulgates a rule, then you can look at the substance of it. But I would also note for the court that the agency has, in fact, tried to correct the procedural defects with the FAQs, and that went before the district court in D.C., which vacated that rule in its entirety as being inconsistent with the statute. I'm not dealing with the case here. No, no, I'm just saying. I'm not the case in here. No, I'm just saying. In other words, that's the future case you're telling us. I'm saying there is a case out there that's already going to address that issue. That's not our case. It's not your case. Your case is only FAQ 33. Not even the D.C. Circuit is doing its work there. That doesn't tell us what to do either. Not at all. Not at all. But you're absolutely correct, Your Honor, that you can simply focus on the procedural defects here, that a policy that was simply posted on a website that is inconsistent with the plain language of the regulations. Nowhere is there a mention of private insurance payments in the regulation itself or the preamble. It's very prescriptive. It directs all the inputs that go into the calculation of this cap, this hospital-specific limit. And there's no room for reading into the – there's no ambiguity whatsoever. Well, let me ask you about the substantive argument you've gotten to. Did you even challenge it? Yes, Your Honor. In our briefs, we definitely do walk through the entire purpose of the statute. Did you call the district court? Yes, we did. We did, Your Honor. And the district court – I believe the district court was trying to understand how the statute works and trying to understand how Medicaid patients and Medicaid-eligible patients are treated under the statute. And that's why I started my argument here trying to respond to the government and trying to explain to the court that you have to look at the whole structure of the statute and realize that what we're talking about here is merely the cap on the payment that a hospital may receive. But the way in which this policy is being interpreted by the government, it's essentially eliminating any dish payment to a hospital that is deemed a dish hospital and is entitled to some minimum level of payment under A and C of the statute. If there's no further questions, Your Honor. I think we understand your position. Thank you. Reply. Your Honor, the reason that the dish payment is being eliminated here is because there were no uncompensated costs. What's the reason we need to reach the substantive argument if it's procedurally infirm? Well, we should talk about why it's not procedurally infirm to be sure. Because if it is, I don't see a reason to get there. But you didn't start out with that, so I don't quite get that. So I think it's important to realize here that the district court did speak to the statutory issue, so we would want at a minimum for this court to make the vehicular here. I understand what the district court did. I'm talking about what the Fourth Circuit is going to do. You saw what the First Circuit did with it, whether the district court speaks to it or not. And the question is, if it is procedurally infirm, why get to a substantive question? That is perfectly fine, Your Honor. Excuse me. What is perfectly fine? Yes, yes, that approach. We agree. Tell me. I'm trying to understand what you are saying is fine. If this court discerns that the interpretation is procedurally invalid, as long as the court makes clear that it is not affirming the district court's vehicular decision. We don't have to do that. We don't have to make clear anything. We just simply say it's infirm. You can worry about that another day. Well, that is what we are hoping the court will do, is make clear that this court is not prejudging. It's not necessary. It's not necessary. That is fine, Your Honor. Obviously, you write the decisions, and we'll determine the best way forward. That's what we do. Now, hopefully, you'll decide that this is not procedurally infirm. And so there will be reason to reach the statutory issue in order to hold the appeal. Which you've not done. You've not spoken to that. Yes, let us do that. If you think it's procedurally not, then you probably ought to speak to that. Yes, let us do that. We think that the First Circuit erred in quite a number of ways. The First Circuit proceeded from an understanding that the agency couldn't make a policy determination through an interpretive rule. And that's quite clearly incorrect, given that statements of policy are excluded from the notice and comment rulemaking requirements under the APA. Here, the First Circuit didn't come to grips with the fundamentally nonbinding nature of this interpretive rule, of this FAQ that was posted on a website. Well, most of the district courts have said at some point or the other in analyzing the issue that the interpretive rule contradicted the number 33, contradicted the underlying 2008 rule. Right. The First Circuit did not say that. It found no inconsistency between the regulation and the rule. But district courts have, including this one, have suggested that there is inconsistency. There is not. We understand that what the First Circuit said is good guidance, but we are going to determine this based upon our own independent analysis. And how the district court did it is going to be the basis on which we will analyze this case. That's right. So if you tell us about what the First Circuit did, we can read that. Yes. But you understand what we are. We're not bound by it. Of course. Of course, Your Honor. And I hope you're not, because, again, with regard to procedural validity, we would hope you would reach the opposite conclusion. And so, therefore, I'm just looking at — was looking to point out some of the ways in which — Can you give us something to tell us to reach out to this conclusion? Because so far, you've just said that it's not right and nothing else. Well, so Judge Agee has brought up the point — I mean, the regulation, the interpretive rule, so long as it's the argument from the plaintiffs and the position of the district court was that it was inconsistent with the 2008 regulation. If you disagree, if you agree with us and with the First Circuit — Well, why don't you — you're going to run out of time. You better tell us why it's not inconsistent. Well, they seem to think that it was inconsistent because there is not expressed discussion. You tell us why the government thinks it's not. Don't worry about these other courts. You tell us your position. So it's fully consistent because it's a regulation that's all about determining, and it says this repeatedly, the uncompensated care costs. This is not about determining or stabilizing hospitals where, as here, they have an unusually high percentage of privately insured Medicaid patients. This is not an abstract — dish payments are not an abstract reward for having treated Medicaid-eligible patients. This really is about stabilizing hospitals and keeping the doors open. And so what we're interested in are hospitals like the Potomac Hospital, another hospital in Virginia that had $43 million in uncompensated costs. Why don't you tell us what in the 2008 rule authorizes the interpretation you've made? I mean, that's — Because — You can make all kinds of policy arguments and make illustrations of what might happen with some other hospital. You've got to give us a rule as to — a reason as to why in the 2008 rule you have the authority to do what you did. Okay. Three things, Your Honor. In C-10, C-10 of the rule says that we have to identify what the costs incurred are. And as we've talked about, and in the context of the statute, to figure out costs incurred, we have to think about what that should be net of. And here we're saying that costs incurred in C-10 needs to be net of money that has come in such that those costs were not ultimately borne by the hospital as uncompensated costs. That's the argument you make with regard to the statute. Right. I mean, it's — the regulation is consistent with the statute, and our interpretation is consistent with both. So C-10 is — the question here, the argument from the plaintiffs, the view of the district court was that our interpretation is inconsistent. If it's consistent under our, it should be upheld. Our position is it's consistent because we are, again, saying that this falls under C-10 costs incurred, and it's consistent with the language of C-11 and C-16, which both direct us to be figuring out uncompensated costs. It's also consistent with other parts of the 2008 rule. Throughout the preamble, there is discussion of the fact that we're trying to identify uncompensated and unreimbursed costs. There is discussion in the preamble of the fact that for dual eligibles, Medicaid patients who are also covered by Medicare, that those Medicare costs and payments both need to be taken into account. Just to flag one as a side note here, plaintiffs have said they agree with the district court's analysis. The district court got some things flatly wrong. The district court was under the misimpression that plaintiffs don't want to count the costs of their privately insured Medicaid patients. So the district court, in saying you can't count the money coming in from private insurance, thought it was creating an even ledger because it thought that the cost of those patients wasn't going into the equation, and therefore, it was consistent to not deduct the payments from their private insurers. But that is not how this statute works. That is not how Congress wrote the statute. And that's not what plaintiffs are asking for. They want to be able to count the costs of treating privately insured Medicaid patients to inflate their dish limit, but then they want to subtract. They don't want to have to subtract from that the money that's come in from those private insurers. So as we explain in our brief, this actually creates a situation where a hospital that has a high number of privately insured Medicaid patients stands to get more money in supplemental dish funding than a hospital that treats only Medicaid patients, that is, patients that only have Medicaid and don't have other sources of coverage. And, Your Honor, there is another portion of the 2008 rule that is consistent, as a final point. Thank you for your time, Your Honor.
judges: William B. Traxler Jr., G. Steven Agee, James A Wynn Jr.